885 So.2d 245 (2004)
Norberto PIETRI, Appellant,
v.
STATE of Florida, Appellee.
Norberto Pietri, Petitioner,
v.
James V. Crosby, Jr., etc., Respondent.
Nos. SC02-2314, SC03-1044.
Supreme Court of Florida.
August 26, 2004.
Rehearing Denied October 18, 2004.
*249 Neal A. Dupree, Capital Collateral Regional Counsel and William M. Hennis, III, Assistant Capital Collateral Regional Counsel, Southern Region, Fort Lauderdale, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General and Celia A. Terenzio, Assistant Attorney General, West Palm Beach, FL, for Appellee/Respondent.
PER CURIAM.
Norberto Pietri appeals the denial of his motion for postconviction relief filed pursuant *250 to Florida Rule of Criminal Procedure 3.850. Pietri also petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons set forth below, we affirm the trial court's order denying Pietri's motion for postconviction relief and further deny his petition for a writ of habeas corpus.

FACTS AND PROCEDURAL HISTORY
Norberto Pietri was adjudicated guilty of the 1988 murder of West Palm Beach police officer Brian Chappell. See Pietri v. State, 644 So.2d 1347, 1349 (Fla.1994).[1] The facts surrounding the murder of Officer Chappell were fully detailed in our direct appeal opinion. See id. at 1350. The jury, by a vote of eight to four, recommended that a sentence of death be imposed, and, following that recommendation, the trial court entered a sentence of death. See id. The trial court found that four aggravating circumstances were present: (1) the murder was committed by someone under a sentence of imprisonment; (2) the murder was committed while Pietri was fleeing after committing a burglary; (3) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP); and (4) the murder was committed to avoid arrest or to escape, the murder was committed to disrupt or hinder the lawful enforcement of laws, and the victim was a law enforcement officer performing his official duties. See id. at 1349.[2] The trial judge found no statutory or nonstatutory mitigating factors to be present. See id. On direct appeal, this Court upheld Pietri's conviction and sentence. See id. at 1355.
On direct appeal, Pietri asserted twenty issues. See id. at 1350 n. 6. Although we denied eighteen of his claims, we held that the trial court had erred in finding the CCP aggravating factor to be applicable. See id. at 1353. Despite the erroneous finding of CCP, however, the sentence of death was upheld in light of the three remaining aggravating factors and the complete lack of mitigation. See id. at 1353-54. Importantly, we noted that even if the trial court had found mitigators, including a deprived childhood, a reasonable likelihood that the trial court would have imposed a life sentence did not exist. See id. at 1354.[3]
Pietri timely filed his initial postconviction 3.850 motion, and two amendments followed. His final amended motion for relief contained thirty-three claims. A Huff[4] hearing was held on August 10, 2000. Shortly thereafter the trial court issued a pre-evidentiary hearing order on Pietri's *251 postconviction motion. In that order, the court concluded that an evidentiary hearing was warranted on three claims and a portion of a fourth. The court summarily denied the remaining claims, holding that they were either legally insufficient, had or should have been asserted on direct appeal, were conclusively refuted by the record, or were moot.
An extensive evidentiary hearing was subsequently held. Pietri presented the testimony of five mental health experts, the two attorneys who served as his defense counsel at trial, an attorney presented to be a "Strickland[5] expert," three attorneys who worked for the public defender's office at the time of Pietri's trial, and six family members and friends of Pietri. The State presented only one witness, a mental health expert. At the end of the hearing, the trial judge requested that both parties submit a written post-evidentiary hearing memorandum addressing the relevant issues. Both sides agreed, without objection. On August 27, 2002, the trial court issued a one-page order denying Pietri's claims. The order stated, "A copy of the State's [post-evidentiary hearing memorandum] is incorporated by reference and made a part of the record." Pietri now appeals the denial of his postconviction motion, asserting ten claims of error.[6] Pietri has also filed a petition for a writ of habeas corpus in which he raises four issues.[7]

3.850 APPEAL
Following the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:
A claim of ineffective assistance of counsel, to be considered meritorious, must include two general components. First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the proceeding that confidence in the outcome is undermined.
*252 Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986). Ineffective assistance of counsel claims present a mixed question of law and fact, and, therefore, are subject to plenary review based on the Strickland test. See id.; see also Stephens v. State, 748 So.2d 1028, 1033 (Fla.1999). Under this standard, this Court conducts an independent review of the trial court's legal conclusions, while giving deference to the trial court's factual findings. See id.
There is a strong presumption that trial counsel's performance was not ineffective. As Strickland provides: "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," 466 U.S. at 689, 104 S.Ct. 2052, and further: "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690, 104 S.Ct. 2052. The defendant alone carries the burden to overcome the presumption of effective assistance: "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Id. at 689, 104 S.Ct. 2052. The United States Supreme Court explained that
a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.
Id. at 690, 104 S.Ct. 2052; see also Asay v. State, 769 So.2d 974, 984 (Fla.2000) ("[T]he defendant bears the burden of proving that counsel's representation was unreasonable under prevailing professional standards and was not a matter of sound trial strategy."). Finally, "[J]udicial scrutiny of counsel's performance must be highly deferential." 466 U.S. at 689, 104 S.Ct. 2052. It is under this legal framework that we address Pietri's claims.

Failure to Present a Voluntary Intoxication Defense
In his first claim, Pietri argues that his trial counsel were ineffective for failing to investigate and present a voluntary intoxication defense, and that if they had performed effectively, it could have been demonstrated that due to Pietri's intoxication, he lacked the requisite specific intent to commit the murder. Pietri's claim must fail, however, because Pietri did not present any evidence at the postconviction evidentiary hearing to demonstrate that he was in fact intoxicated at the time of the offense. Furthermore, he did not present any competent evidence proving his inability to form the specific intent to commit the crime. Pietri relies upon the theory that as a result of his persistent use of cocaine on the days prior to the crime he was in a state of "metabolic intoxication" at the time of the offense and, therefore, could not have formed the requisite specific intent. This Court has consistently rejected this theory, holding that evidence of "metabolic intoxication" is not admissible at trial. Because counsel cannot have been ineffective for failing to present inadmissible evidence, Pietri's first claim is denied.
Importantly, it must be recognized that Pietri is not asserting that he was actually *253 intoxicated (i.e. that had he been given a blood test it would have registered any level of cocaine in his bloodstream) at the time of the offense. Pietri's own expert, Dr. Lipman, testified that it was his conclusion that Pietri was on the "clearance curve of the cocaine elimination phase" at the time that the offense occurred. In other words, Dr. Lipman opined that the actual amount of cocaine in Pietri's system at the moment he shot the officer would have been quite low. Dr. Lipman's conclusion is supported by Pietri's own testimony at trial, where he explained that several hours had passed between the time he smoked the last of his cocaine and the time he fired the fatal shot into Officer Chappell.
Apparently recognizing that he has no valid claim that he was actually intoxicated at the time of the offense, Pietri is now attempting to assert that his chronic drug abuse had a lasting impact, and that while he had little to no cocaine in his bloodstream at the time of the offense, he was under the effects of the cocaine to the same extent as if he were legally intoxicated. At the evidentiary hearing Pietri presented Dr. Lipman, who asserted that he would have testified that when cocaine is used chronically, it causes toxic changes in the brain. Those changes do not evaporate when the drug leaves the body, and in fact the toxicity effect can extend for weeks. As a result of his persistent cocaine use, the argument flows that Pietri was suffering from a withdrawal syndrome. He had become paranoid, had increased anxiety, agitation, fear, and irrational thought. Dr. Lipman offered that, in his opinion, at the time of the offense, Pietri did not have the specific intent to kill. Pietri's actions were consistent with an impulsive act that had been completed before he even knew what he had done.
Pietri presented a total of five mental health experts at the evidentiary hearing. Dr. Lipman was the only expert who explicitly expressed the opinion that Pietri lacked the specific intent to commit murder. Similar to Dr. Lipman's testimony, Dr. Krop, a clinical psychologist, testified that had he been called to offer his opinion, he would have explained that Pietri had a history of substance abuse and that he was either actively intoxicated or withdrawing from substances at the time of the offense. He would have testified concerning the effects of cocaine and how extensive use of the drug can cause individuals to have problems with judgment and impulse control, and how the drug can cause them to become paranoid and hypervigilant. Dr. Krop did not, however, offer any opinion regarding Pietri's ability to form the specific intent to commit the offense. A third expert, Dr. Caddy, testified that he could not give an exact opinion regarding what impact the cocaine had on Pietri at the time of the offense. He believes Pietri was in withdrawal and had reactive judgment problems. Dr. Caddy stated that he could not rule out the possible significance of a cocaine intoxication state which triggered Pietri into doing something he would not have otherwise done. The two remaining mental health experts offered no opinion regarding Pietri's mental state at the time of the offense, and one doctor, Dr. Goldberg, specifically noted that he never talked with Pietri about such subject. The one mental health expert presented by the State testified that based upon Pietri's ability to clearly recall the events of the crime, Pietri was able to form the specific intent to commit the offense.
While Pietri presented several witnesses at the evidentiary hearing who testified concerning his extensive drug use both historically and during the four days immediately preceding the crime, Pietri did not present any competent evidence demonstrating *254 that he was actually intoxicated at the time of the offense. Notably, it is unlikely that there is any one who could assert that Pietri was intoxicated at the time of the offense or could even provide an opinion regarding Pietri's mental state at the time of the offense as Pietri himself testified during the guilt phase that he was alone at the time of the crime and for several hours preceding the fatal event.
Pietri has failed to demonstrate that his trial counsel provided deficient performance. The only witness presented at the evidentiary hearing who provided an opinion regarding Pietri's inability to form the specific intent required for first-degree premeditated murder was Dr. Lipman. However, even if Pietri's trial counsel had called Dr. Lipman to testify at trial, because Pietri has failed to demonstrate that he was actually intoxicated at the time of the offense, and, in fact, actually presented testimony to the contrary, it is unquestionable that the testimony of Dr. Lipman would have been inadmissible.
Although this Court has repeatedly held that evidence of voluntary intoxication is admissible to prove the defendant lacked the specific intent to commit premeditated murder, see Spencer v. State, 842 So.2d 52, 63 (Fla.2003); Chestnut v. State, 538 So.2d 820, 822 (Fla.1989), we have further held that "there are limitations regarding the admissibility of evidence of mental disease or defect within the defense of voluntary intoxication." Spencer, 842 So.2d at 63. We explained in State v. Bias, 653 So.2d 380 (Fla.1995), that such limitations are required "to ensure that the defense of voluntary intoxication is not utilized as a label for what in reality is a defense based upon the doctrine of diminished capacity." Id. at 383; see also Linehan v. State, 476 So.2d 1262, 1264 (Fla.1985) ("We emphasize that voluntary intoxication is an affirmative defense and that the defendant must come forward with evidence of intoxication at the time of the offense sufficient to establish that he was unable to form the intent necessary to commit the crime charged."). It is unquestionable that at the time of Pietri's trial, diminished capacity was not a cognizable defense in Florida. See Chestnut, 538 So.2d at 825. In Chestnut, we held that evidence of an abnormal mental condition not constituting legal insanity is not admissible for the purpose of proving that the defendant could not or did not entertain the specific intent necessary for proof of the offense. See id. at 820. Pietri essentially asserts that evidence could have been presented, not to show that he was legally insane or voluntarily intoxicated, but instead that his prior drug abuse resulted in a mental defect  "metabolic intoxication"  a diminished capacity which produced an inability to form the specific intent to commit premeditated murder. Such evidence was inadmissible.
We recently addressed this identical question in Spencer. There, in postconviction, Spencer claimed that his trial counsel was ineffective for failing to present expert testimony in the guilt phase regarding his "dissociative state" that occurred during the murder. See Spencer, 842 So.2d at 62. At an evidentiary hearing, Spencer presented two experts to support his claim, one of whom was Dr. Lipman, the same witness Pietri has presented here. See id. In Spencer, Dr. Lipman stated "that he could also have testified that Spencer's mind was impaired at the time of the offense based upon the residual effects of a two-week alcoholic binge even though Spencer's blood alcohol level was zero at the time of the murder." Id. This Court concluded that "the evidence of Spencer's `dissociative state' would not have been admissible during the guilt phase of the trial." Id. at 63. Dr. Lipman's substantially similar testimony likewise would *255 have been inadmissible during the guilt phase of Pietri's trial.
In another recent decision, this Court again rejected a claim that counsel was ineffective for failing to present the defense that the defendant was incapable of forming the premeditated intent to kill because of his abuse of crack cocaine before the murder. See Henry v. State, 862 So.2d 679 (Fla.2003). There, we wrote:
As we said in State v. Bias, Gurganus [v. State, 451 So.2d 817 (Fla.1984), ] stands for the principle that "it is proper for an expert to testify `as to the effect of a given quantity of intoxicants' on the mind of the accused when there is sufficient evidence in the record to show or support an inference of the consumption of intoxicants." 653 So.2d at 383. Thus an expert "may need to explain why a certain quantity of intoxicants causes intoxication in the defendant whereas it would not in other individuals." Id.

Id. at 683 (emphasis supplied). In Henry, we denied the claim because Henry had "failed to present any evidence that he was actually intoxicated at the time of the offense." Id. We noted that Henry did not present any evidence that the mental health experts or anyone else could have testified that he was intoxicated at the time of the offense. See id. Similarly, Pietri did not present any evidence at the evidentiary hearing to establish that he was actually intoxicated at the time of the offense. Therefore, because Pietri could not demonstrate that he was actually intoxicated at the time of the offense and, further, because the evidence of "metabolic intoxication," which allegedly produced a diminished capacity, would have been inadmissible at trial, Pietri's defense counsel was not ineffective for failing to present a voluntary intoxication defense and Pietri's first claim is therefore denied.[8]

IAOC During Jury Selection
In his second claim, Pietri asserts that his defense counsel was ineffective during the jury selection process. The trial court held that this claim, or a variation of it, was decided adversely to Pietri on direct appeal and is, therefore, procedurally barred. In his direct appeal, Pietri raised two issues regarding challenges for cause. As a guilt phase issue, Pietri argued that the trial court erred when it denied his challenges for cause. See Pietri, 644 So.2d at 1350 n. 6. This Court held that, pursuant to Trotter v. State, 576 So.2d 691 (Fla.1990), the issue had not been preserved for review because Pietri's counsel had failed to identify, at trial, a specific juror that he would have excused. See Pietri, 644 So.2d at 1352.
The second issue was raised as a penalty phase claim. Pietri asserted that the trial court erred in denying his challenge for cause of a juror who would automatically vote for death if someone was convicted of the first-degree murder of a police officer. See id. at 1350 n. 6. With respect to that issue, we wrote:
Pietri claims the trial court should have excused juror Howard Carroll for cause because he said during voir dire that he would automatically vote for the death penalty if there was a verdict of first-degree murder with a police officer as a victim. The defense challenged Carroll for cause specifically because of his views on the death penalty and renewed that motion before the penalty phase began. After Pietri's counsel initially challenged Carroll, the judge explained the system of aggravating and *256 mitigating factors, and Carroll said he could weigh those factors in making a sentencing recommendation.
Pietri's counsel challenged Carroll for cause because of his views on the death penalty. But when he sought additional peremptory challenges, he failed to identify Carroll as a juror he would have struck peremptorily. Thus, this issue has not been preserved for our review. See Trotter, 576 So.2d at 693. The fact that Pietri again challenged Carroll for cause before the penalty phase does not preserve this issue.
Id. at 1353.
As previously noted, the postconviction trial court summarily denied Pietri's instant claim, finding it had been presented and decided adversely to him on direct appeal. The trial court's summary denial was in error. It is well recognized that a defendant may not couch a claim decided adversely to him on direct appeal in terms of ineffective assistance of counsel in an attempt to circumvent the rule that postconviction may not serve as a second appeal. See Cherry v. State, 659 So.2d 1069, 1072 (Fla.1995). However, that is not what Pietri is attempting to do here. The merits of this claim were not decided adversely to Pietri on direct appeal. Instead, this Court held that the issue had not been preserved for review. See id. at 1352-53. Pietri is now timely asserting a claim of ineffective assistance of counsel, maintaining that trial counsel should have properly preserved the issue for review. However, while the trial court's justification for denial of this claim was erroneous, its ultimate conclusion that the claim should be denied was proper because Pietri cannot satisfy the prejudice prong of the Strickland test for ineffective assistance of counsel.
We have explained that a court considering a claim of ineffectiveness of counsel "need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied." Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986). We recently held that "[t]o establish prejudice, `[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Gaskin v. State, 822 So.2d 1243, 1246-47 (Fla.2002) (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052). In the instant action, it is unnecessary to determine if the performance by trial counsel was deficient for failing to properly preserve the issue concerning Pietri's challenge for cause of juror Carroll because even if the issue had been properly preserved, it is clear the trial court's denial of the challenge for cause was not in error. Therefore, Pietri has failed to demonstrate that there is a reasonable probability that but for his counsel's unprofessional error, the result of the proceeding would have been different. Our confidence in the outcome is not undermined.
During voir dire, juror Carroll responded to inquiry and made the following statement: "I have to say if the verdict came down from the jury as being guilty of first degree murder, then I would have a stronger opinion about the Defendant killing a police officer than not a police officer." Defense counsel, Peter Birch, then asked juror Carroll: "Would you automatically vote for the death penalty if there was a verdict of first degree murder as to a police officer?" Juror Carroll's response was "I would." Subsequently, defense counsel challenged Mr. Carroll's placement on the jury "based on his position on the death penalty." The court and state attorney then conducted additional questioning *257 of the challenged juror. The judge then explained what would occur during the penalty phase with regard to the presentation of evidence in support of both aggravating and mitigating factors, and the law that a juror must follow in finding and weighing the factors prior to voting on whether to impose the death penalty. The record reflects that at the conclusion of the additional questioning and upon being provided the appropriate criteria, juror Carroll affirmed that he could follow the law and would not automatically vote for death simply upon the existence of a verdict of guilt.
Jurors who initially may express firm views pertaining to the death penalty are permitted to serve if they clearly indicate an ability to abide by the trial court's instructions. See Johnson v. State, 660 So.2d 637, 644 (Fla.1995); Bryant v. State, 656 So.2d 426, 428 (Fla.1995); Penn v. State, 574 So.2d 1079, 1080-81 (Fla.1991). We have held that:
The test for determining juror competency is whether the juror can lay aside any bias or prejudice and render a verdict solely upon the evidence presented and the instructions on the law given by the court. Lusk v. State, 446 So.2d 1038, 1041 (Fla.1984). In applying this test, if "any reasonable doubt exists as to whether a juror possesses the state of mind necessary to render an impartial recommendation as to punishment, the juror must be excused for cause." Hill v. State, 477 So.2d 553, 556 (Fla.1985).
Bryant, 656 So.2d at 428 (citations omitted). Further, in Johnson, we reasoned:
On this question, the trial court is in the best position to observe the attitude and demeanor of the juror and to gauge the quality of the juror's responses. If there is competent record support for the trial court's conclusions regarding rehabilitation, then the appellate courts of this state will not reverse the determination on appeal based on a cold record.
Johnson, 660 So.2d at 644.
In Penn, a prospective juror initially indicated that he strongly favored the death penalty. See Penn, 574 So.2d at 1080. After questioning by the court and the state, the prospective juror said that he would follow the law as instructed. See id. This Court held in that decision that the trial court had not abused its discretion in refusing to excuse the juror for cause because he had demonstrated his competency by stating that he would base his decision on the evidence and instructions. See id. at 1081. Similarly, in Bryant, during initial questioning, six prospective jurors expressed strong support of the death penalty and a predisposition to impose the death penalty if the defendant was convicted of first-degree murder. See Bryant, 656 So.2d at 428. However, during questioning by the state, five of the six jurors stated that they would either follow the court's instructions or would weigh the aggravating and mitigating factors to determine whether death was the appropriate sentence. See id. As in Penn, this Court held that the trial court had not abused its discretion in refusing to excuse those five jurors for cause. See id.
Juror Carroll initially indicated that he was predisposed to vote for a sentence of death when a defendant is found guilty of the first-degree murder of a police officer. However, after receiving information concerning the controlling law, Carroll clearly expressed that he would be a proper juror. He clearly indicated that he would follow the law and weigh the aggravating and mitigating factors. Therefore, as in Bryant and Penn, the trial court did not abuse its discretion in denying Pietri's challenge for cause of juror Carroll. Because the trial court's ruling was not erroneous, *258 Pietri has failed to demonstrate prejudice as a result of his counsel's failure to properly preserve this issue for appeal. Pietri's second claim is therefore denied.

Failure to Investigate and Present Mitigating Evidence
Pietri next asserts that his trial counsel was ineffective for failing to properly investigate and present available mitigating evidence during the penalty phase. He contends that had additional evidence been presented it would have established numerous mitigating factors. Specifically, Pietri argues that counsel: (1) should have retained a neuropsychologist to evaluate him and conduct standard psychological testing and neuropsychological testing; (2) should have provided Dr. Caddy, the mental health expert who testified for the defense during the penalty phase, with background material; (3) should have had Pietri evaluated by an addictionologist or neuropharmacologist; (4) did not adequately investigate Pietri's drug history by interviewing family and friends; (5) did not inquire of either expert who testified for the defense about the presence of the statutory mental health mitigators; and (6) did not inform the jury about Pietri's horrible background, including difficulties of his childhood, the full extent of his addiction history, and his cognitive and neurological disorders.
Initially, it is relevant to review and understand the evidence defense counsel did present during the penalty phase of Pietri's trial as this is, unquestionably, not a case in which counsel failed to present any evidence of mitigation. Defense counsel presented eight witnesses. First, trial counsel presented William Pietri, the defendant's older brother. William testified that their father was a violent man, an alcoholic who drank daily and beat their mother in the presence of the children. Their father abandoned the family in 1965 when he left Puerto Rico and moved to New York City. Further, William explained that he and the defendant worked together in the construction industry in 1983, and that the defendant was a "very nice kid" before he became involved with drugs.
Trial counsel also presented Yoris Santana, who was with Pietri during the days immediately prior to the murder, after Pietri had escaped from prison. Santana explained that during the four days prior to the murder Pietri was involved in heavy drug use, specifically rock cocaine. This witness testified that Pietri was using cocaine the entire time they were together  "24/7". On cross examination, he stated that Pietri had problems when he was high on drugs  he was always nervous and had a lot of tension, as though he were crazy.
Marino Pietri, another of the defendant's brothers,[9] also testified at trial. Marino stated that he and the defendant had the same mother and father and that their parents had a total of nine children together.[10] The jury also heard that the entire family lived together in one house that had only two bedrooms, a living room, and a kitchen. There was no indoor bathroom, running water, or television. The family was extremely poor, and each child only had one outfit that he or she would wear every day and have washed on the weekends. Marino corroborated William's testimony regarding the adverse impact of their father. Marino stated that their father was an alcoholic who would drink every day after work. Their father constantly beat their mother in the presence *259 of the children, and would physically abuse everyone in the house; he was mean to the children when he was drunk. After their father left, he never returned or sent money to care for the family.
Marino detailed how the family moved to the United States in 1969. He explained that Freddy Torres (who the defendant claimed sexually abused him) lived with the family and paid special attention to Pietri by giving him candy and toys. Torres did not do the same things for anyone else in the family. Marino explained that Pietri had a cross-eye condition in his right eye and had surgery in an attempt to correct the problem. However, the surgery caused the defendant to become blind in his right eye. Marino stated that the defendant always attended school, and he worked for Marino as a landscaper when he was sixteen or seventeen. According to Marino, Pietri was a good worker and was nice; he was a "perfect boy." From 1979 until 1983, Pietri was described as doing fine and as a nice man while he lived with his girlfriend and their daughter. However, Pietri then started using drugs. Marino noted that the defendant would go to jail, get out, and immediately revert to using drugs again.
Trial counsel also presented the defendant's sisters, Ramona Rivera and Ada Serrano Liddell, as witnesses. Rivera stated that Pietri was a loving brother. Liddell testified that Pietri was a very fun person when they were growing up. He was "one of the nicest brothers [she] had." Pietri would do things for her and her friends, such as take them roller skating. Liddell remembered when Pietri began using cocaine. She testified that he became so addicted that he used it all day, all night, every day. She explained that the defendant was very paranoid and scared when he was using cocaine and that he changed substantially after he started abusing cocaine. On one occasion she described, Pietri threatened to kill himself with a shotgun.
The final lay witness presented at trial by the defense was Roger Paul, a minister who met with Pietri while he was incarcerated. Paul explained that Pietri had contacted him after the murder, just before the trial began. He stated that Pietri was a happy guy, really friendly and joyful. He testified that Pietri had been saved by Jesus Christ.
The first of two expert witnesses presented was Jody Iodice, a social worker and former drug addict who now works extensively with drug addicts. She explained in her testimony that there are certain people who are more prone to becoming addicted to drugs, including those who come from families with an addict, people who are missing a parent or are not nurtured, and people who experience domestic violence. She explained that freebase cocaine is a highly addictive drug that reaches the brain faster than any other form of cocaine. The effects of freebasing are more intense, and freebasing causes extreme anxiety, exhilaration, restlessness, excitement, and hyperarousal (an extreme level of awareness). The "crash" following the use of the drug causes extreme irritability, hostility, argumentativeness, erratic behavior, unpredictablility, and uncontrollable kinds of behavior. Also attributable to this condition is poor attention span, distractability, extreme depression, and paranoia. These symptoms can last for any length of time from an hour to much longer. She also explained that the drug does not necessarily distort a person's memory, and the fact that Pietri could give almost an hour-by-hour account of his activities on the day of the offense does not preclude the possibility that he was under the influence of cocaine during the four-to five-day period preceding the crime. Finally, *260 Iodice stated that because Pietri continued to smoke marijuana while incarcerated, he was not recovering from his cocaine addiction when he was confined.
On cross examination Iodice explained that the "down phase" after cocaine use usually extends sixty minutes, but it could be longer. In fact, it could be longer than two hours. Even without the drug an individual can extend thirty days in the "down phase." Iodice explained that drug usage does not impair intellect and does not impair the ability to make cognitive decisions. Drug users still know what they are doing and still know right from wrong. However, on redirect, she related that cocaine does alter one's judgment. Those on drugs do not thoughtfully consider anything and do not anticipate the consequences of their actions. There is no decision-making process and actions are produced by pure impulse. There is no self-awareness, no forethought about actions and for those controlled by drugs everything is based on the drive to obtain the drug.
A second mental health expert appearing at trial, Dr. Caddy, explained that he had consulted with Pietri prior to his testimony, had conducted a mental status exam, and had obtained a history. Caddy opined that between birth and the age of eighteen, Pietri had a very tragic and chaotic life. The history revealed that he was born with an eye condition for which surgery was performed but resulted in the loss of sight in his right eye. His father remained with the family until Pietri was about six, but was often drunk and very abusive; virtually no day passed without Pietri's mother being beaten by his father in the presence of the children. The father's violence was also extended upon the children. The history also revealed that Pietri was sexually abused by Torres for about two years. Pietri's mother was totally ineffective as a parent and she was unable to deal with her children. Pietri's life lacked family structure, no one cared for the children, no limits were set, there was no management, and Pietri had no source of comfort.
Caddy testified that around the age of thirteen, Pietri himself began aberrant behavior in the form of the molestation of a another male child and demonstrated confusion about his own sexual identity. Pietri sought comfort and a relationship with his brother Edwin, but Edwin rejected him and physically abused him frequently. When Pietri reached the age of fourteen he had already become very vulnerable to drug use, abuse, and addiction.
When he was living in California, Pietri attempted to derive personal status and identity from dysfunctional groups (i.e., he joined a gang) and became involved in trouble. Although Caddy was of the opinion that Pietri is of average intelligence, Pietri dropped out of school when he was sixteen as he began using drugs and drinking excessively. Later, Pietri pulled himself together and at nineteen began to settle into a relationship with a woman and had a child. At this point in his life he was working steadily and had some pride in himself.
Eventually, however, Pietri started smoking marijuana and was later introduced into the world of cocaine by his brother Edwin. Prior to initiating cocaine use, Pietri had already abused PCP, marijuana, and alcohol. Along with addiction to cocaine, Pietri experienced the loss of his job and his relationship with his girlfriend and his child. He turned to crime, including burglaries, to support his drug habit. Although Pietri experienced time in jail for burglary, as soon as he was released he again committed a burglary to obtain money to purchase cocaine. Pietri was incarcerated for twenty months; however, *261 this was just a "time-out" from drug addiction for one in his position. There was no rehabilitation related to his jail sentence, and Caddy reasoned that if Pietri smoked marijuana while in jail as he claimed, he was simply exchanging one drug for another.
With regard to the effects of drug addiction, Caddy explained that when one is withdrawing from cocaine he is "hyperkinetic." Everything is intense and stressed accompanied by a tendency to overreact to stimuli. One experiences a general sense of confusion, without a real distortion of the world around as the withdrawal advances. The withdrawal process produces the experience of having a high level of stress. Caddy opined that on the day of the offense, if Pietri had last used cocaine at 6 a.m., he was not high at 9 or 10 a.m., but that does not indicate that he was not under the influence of cocaine. Pietri was still experiencing the residual effects of having ingested cocaine for three to four days prior to the day of the offense. Caddy described Pietri as being in "a sort of cocaine withdrawal state." Caddy explained that Pietri's main focus at that time of the offense would have been acquiring more cocaine. He had relatively poor judgment, and it clouded his appreciation of the consequences of his behavior. Pietri was unable to plan things and his judgment was impaired and defective.
Finally, Caddy recounted the events Pietri had related to him concerning the offense for which he had been charged. Pietri informed Caddy that he had not realized that he was speeding on Interstate 95. When he became aware that a police officer was following him he became frightened and his mind began to race as to what he should do. He began stuffing stolen jewelry in his pockets and at first thought he should run. However, there was no place to run, so Pietri decided that he would flee in the vehicle, but he finally decided to surrender. Pietri craved cocaine and he was afraid of a return to incarceration. As he stuffed more jewelry into his pants, his hand came into contact with the gun he possessed. Pietri picked up the gun, aimed it at the police officer, and fired. Caddy explained that the thought processes Pietri expressed were consistent with someone who had used cocaine heavily and his conduct was simply a reaction. Caddy agreed with Judy Iodice that cocaine does not impact memory to the extent that one's memory fails to function.
Despite the numerous witnesses presented, both lay and expert, Pietri now claims his defense counsel could have and should have done more. Although Pietri has outlined what he now believes counsel should have done, he has totally failed to explain what impact the additional work by counsel would have had. Therefore, it is necessary to examine the evidence that was presented during the postconviction evidentiary hearing and compare it with the evidence that was actually presented during the penalty phase to determine whether and to what extent the evidence presented during the evidentiary hearing would have impacted the penalty phase.
Pursuant to Strickland, counsel has an obligation to conduct a reasonable investigation into mitigation. See Strickland, 466 U.S. at 691, 104 S.Ct. 2052. Initially, postconviction counsel argues that defense counsel was ineffective for failing to hire, in a timely manner, a mental health expert to examine Pietri and conduct psychological testing. A review of the pre-trial actions of defense counsel to secure mental health expert testimony is therefore relevant here. Peter Birch was appointed to represent Pietri in January 1989. He obtained co-counsel in October 1989. Pietri's trial began on January 22, *262 1990.[11] The record reflects that on December 27, 1989, counsel filed a pre-trial motion requesting at least a thirty-day delay between the verdict and the beginning of the penalty phase. The court granted that motion. The guilt verdict was received on February 7, 1990. On that same day, the judge set February 22, 1990, for the start of the penalty phase.
On February 15, 1990, defense counsel filed a motion to continue the penalty phase, asserting that counsel had relied upon the judge's pre-trial order granting at least a thirty-day period between the guilt phase and the penalty phase. Counsel explained that it would be difficult to be prepared by February 22, 1990, due to their reliance upon the judge's pre-trial order granting their motion for the thirty-day period. At a hearing on the motion on February 15, Birch asserted that he and his co-counsel had made a good faith effort to be prepared, having worked on nothing but Pietri's case "day and night" since the guilt verdict, but they had not found a suitable mental health expert to assist them. The court was advised that as of that date counsel had contacted at least five mental health experts but had not secured one who could provide help, and they were in the process of contacting two additional experts. Birch admitted that after the judge granted the pre-trial motion to delay the penalty phase, he had concentrated primarily on the guilt phase, but since beginning work on the penalty phase he had discovered various matters that required additional work. Counsel again expressed that they had made a good faith effort to prepare, but they needed at least the thirty-day interval promised by the court pre-trial. The court denied the defense motion for extension or to continue.
At the evidentiary hearing, Birch testified that in December 1989 he had been focusing on the guilt phase. The primary reason for such focus was due to the facts presented and the time necessary to work toward an advantageous plea agreement. Therefore, less time had been directed to preparing for the penalty phase. Until January 14, 1990, one week before the trial began, counsel firmly believed that the trial would not commence because there was a written, signed plea agreement between Pietri and the State.[12] Although Birch admitted that he was not primarily focused on the penalty phase in December, he also stated that he was attempting to secure a mental health expert for phase two. On December 5, 1989, Birch sent a letter to a mental health expert, Dr. Krop, and enclosed with the correspondence the probable cause affidavit and the lead investigator report on Pietri's case. Krop performed an evaluation of Pietri on December 12, and was officially appointed on December 22, 1989. After his evaluation, however, Krop advised Birch that in his opinion Pietri was competent to proceed and was sane at the time of the offense. He also advised that Pietri had no psychiatric history or evidence of any psychotic process disturbance or organic disorder. There was evidence, however, of substance abuse and potential physical and sexual abuse.
Birch testified at the evidentiary hearing that he remembered being disappointed in the opinions of Dr. Krop. Counsel decided, after receiving Dr. Krop's opinions and possibly one additional phone conversation with Krop, that Krop would not be a suitable expert for the penalty phase. Birch *263 recalled being extremely disappointed upon receipt of Krop's evaluation. Specifically, Birch stated that he decided that he would not use Krop because Krop was less than enthusiastic about the case, and counsel concluded that Krop would be of little assistance. Birch recalled that Krop did not speak well of Pietri as the two were leaving the prison after Krop evaluated Pietri. All-in-all Birch concluded that Pietri and Krop "just didn't click."
The record supports that after unsuccessfully soliciting the assistance of Dr. Krop, Birch contacted Dr. Haynes. Birch and Haynes consulted first by phone and then in person on January 18, 1990. Two additional consultations occurred on February 12 and February 15. Birch could not recall all of the details of his meetings with Haynes, but did remember that Haynes was of the view that Pietri presented a really difficult case. Birch believed that he, his co-counsel, and Haynes were of the view that Haynes could not provide them help because there was not really anything he could offer in the nature of mitigation.
Birch recalled talking to other mental health experts after Haynes, attempting to secure additional experts who would testify. As noted above, he advised the court during the hearing on February 15 that he had contacted five mental health experts without success and was in the process of contacting additional prospects. Birch testified at the evidentiary hearing that he was very frustrated because he did not have much success finding a mental health expert, and noted that he had not restricted himself to only a search of the local area.
Birch's first contact with Dr. Caddy, the mental health expert who testified during the penalty phase, was on February 17, 1990, five days before the start of the penalty phase. Birch remembered that Caddy may have desired more time for evaluations, but Caddy did speak with some of Pietri's family members. Birch's co-counsel, Donnie Murrell, confirmed that both he and Birch were making attempts to locate an expert for the penalty phase proceedings.
As we have noted, to prevail on a claim of ineffective assistance of trial counsel, a defendant must demonstrate, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052; Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986). The first inquiry requires the demonstration of "errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Under this analysis, we hold that Pietri has failed to demonstrate that counsel was deficient in securing a mental health expert. Although counsel was admittedly not focused on the penalty phase from the outset or in the months prior to the start of the guilt phase trial, the record clearly reflects that counsel began attempts to secure a mental health expert well before the penalty phase began. There was evidence of clear justification for not utilizing Dr. Krop as a witness, see Asay v. State, 769 So.2d 974, 984 (Fla.2000) ("[T]he defendant bears the burden of proving that counsel's representation was unreasonable under prevailing professional standards and was not a matter of sound trial strategy."), and counsel subsequently contacted at least four experts before finally locating one who could offer assistance. In Hodges v. State, 28 Fla. L. Weekly S475, 2003 WL 21402484 (Fla. June 19, 2003), this Court held that trial counsel had conducted a reasonable background investigation where the "deficient results of that investigation were attributable *264 to an uncooperative defendant and unwilling, absent, or recalcitrant witnesses." Id. at S476, 2003 WL 21402484. While there is no claim here that Pietri was uncooperative, the record does reflect that at least one of the mental health experts contacted by defense counsel, Dr. Haynes, was unwilling to testify. Here we do not even have deficient results because the evidence ultimately presented at trial encompassed the material for which Pietri now asserts fault with counsel.
Unquestionably, the best-case scenario would have been for Dr. Caddy to have been secured earlier to allow more time for his review of all matters related to Pietri. However, we do not agree that counsel's performance was constitutionally deficient here, where the record reflects that counsel attempted, for over two months prior to the penalty phase, to secure a mental health expert. Counsel contacted at least five experts, and ultimately produced Dr. Caddy and Jody Iodice at trial. Importantly, counsel also requested, both pre-trial and post-verdict, a continuance before the start of the penalty phase to allow additional time for preparation. The judge ultimately denied the request. This is not a situation in which defense counsel did nothing to secure a mental health expert to evaluate his client. Here defense counsel made a reasonable effort to secure a mental health expert and such efforts were successful. Additionally, the expert ultimately provided competent testimony on the defendant's behalf, which addressed the matters which Pietri now claims were overlooked. We cannot say that defense counsel provided constitutionally deficient performance.
Even if we were to hold that defense counsel was deficient in the attempts to secure a mental health expert, based on the evidence presented at the evidentiary hearing, it is clear Pietri has failed to demonstrate that he suffered prejudice as a result. While defense counsel's performance can always be second-guessed and attacked on postconviction, Strickland mandates that we look at the evidence that was actually presented compared to that presented at the postconviction evidentiary hearing. Here, it is clear that Pietri has failed to actually provide any new evidence.
At the evidentiary hearing, five mental health experts testified on Pietri's behalf. The first was Dr. Krop, with whom defense counsel initially consulted but ultimately decided not to utilize. As we hold that defense counsel provided a valid justification for not utilizing Dr. Krop, it is unnecessary to review his testimony. However, we note that Dr. Krop conceded, and the record supports, that much of the information he provided during the evidentiary hearing was the same as that covered by Dr. Caddy during his penalty phase testimony.
The second mental health expert to testify was Dr. Lipman. As noted previously, Lipman's testimony would have been inadmissible during the guilt stage to support a voluntary intoxication defense. However, Lipman testified that had he been called during the penalty phase, he would have opined that Pietri was under the influence of an extreme mental or emotional disturbance at the time of the crime. In his opinion, Pietri could appreciate the criminality of his conduct, but his ability to conform his behavior to the requirements of the law was impaired. Lipman's opinion was based upon his evaluation of Pietri and Pietri's extensive drug addiction. In his view, Pietri does not suffer from a psychosis, but he does have an organic mental disorder caused by his toxic condition at the time of the offense.
The third expert to testify was Dr. Caddy. Importantly, Caddy stated that his *265 review of information provided by postconviction counsel had not fundamentally changed or affected the conclusions or opinions he previously provided during the penalty phase. Caddy simply believed that his conclusions offered during the postconviction proceeding were now more supported than those at the time of his penalty phase testimony. Notably, Caddy stated during the evidentiary hearing that he could not testify that Pietri's mental state at the time of the crime was extremely impaired or that Pietri was not able to appreciate the criminality of his conduct. He again stated that his testimony remains the same as it was in 1990.
The next expert to testify was Dr. Sultan. Sultan described, in detail, Pietri's recollections of being raped as a child. In her opinion, a person who has been sexually abused would more likely become an early abuser of drugs and alcohol, would have difficulty regulating his emotions, would be irritable, depressed, and angry, and would be more likely to experience the severe effects of any chemical he used. Sultan opined that Pietri suffers from a brain injury in the form of a diagnosable personality disorder resulting from the sexual abuse. On cross-examination, however, Sultan admitted that no member of Pietri's family could corroborate his sexual abuse, despite the fact that ten to twelve people were living in a small house at the time Pietri claims he was abused, and he told her that he screamed out in pain whenever he was raped. Finally, Sultan conceded that the findings of Caddy were consistent with her opinions.
The final mental health expert to testify for Pietri was Dr. Goldberg. Goldberg conducted a battery of psychological tests on Pietri and concluded that Pietri's IQ is 76, which places him in the mildly impaired range. Goldberg detailed the tests he performed and the results produced. Notably, Goldberg concluded that Pietri's performance on many of the tests was normal, while on others he showed indications of being mildly or moderately impaired. Goldberg opined that Pietri's cognitive impairments were due to cerebral dysfunction. When asked if he felt Pietri satisfied any of the mitigating factors listed in the statute, he stated that Pietri satisfied only the "catchall criteria."
In Jones v. State, 732 So.2d 313 (Fla.1999), we held that the record presented there did not establish a reasonable probability that absent the claimed errors, the sentencer would have concluded that the defendant should not have been sentenced to death. See id. at 321. We noted that the defendant had failed to demonstrate, at the postconviction hearing, an inadequacy in the penalty phase testimony of the defendant's mental health expert, and the defendant had simply presented additional mental health experts who came to different conclusions than the penalty phase expert. See id. at 320. There, we reasoned: "The evaluation by Dr. Anis is not rendered less than competent, however, simply because appellant has been able to provide testimony to conflict with that presented by Dr. Anis." Id. Further, we held that the defendant had failed to demonstrate that he suffered prejudice because "[a]lthough the court found no statutory or nonstatutory mitigation, by virtue of the testimony of Dr. Anis, the sentencing jury was aware of most of the nonstatutory mitigation regarding appellant's impoverished and abusive childhood. The jury was also aware of appellant's abuse of alcohol and excessive use of marijuana." Id. at 321; see also Brown v. State, 755 So.2d 616, 636 (Fla.2000) (Strickland standard not satisfied where mental health expert testified during postconviction hearing that even if he had been provided with additional background information, his penalty phase testimony would have been *266 the same); Rose v. State, 617 So.2d 291, 295 (Fla.1993) ("The fact that Rose has now obtained a mental health expert whose diagnosis differs from that of the defense's trial expert does not establish that the original evaluation was insufficient."); Provenzano v. Dugger, 561 So.2d 541, 546 (Fla.1990) (holding prejudice not demonstrated where mental health testimony would have been largely repetitive; also, fact that defendant had secured an expert who could offer more favorable testimony based upon additional background information not provided to the original mental health expert was an insufficient basis for relief).
None of the mental health experts presented during the evidentiary hearing below claimed any inadequacies in Dr. Caddy or Jody Iodice's penalty phase testimony. Additionally, both Dr. Krop and Dr. Sultan acknowledged that their testimony was consistent with Dr. Caddy's. Dr. Caddy testified that his opinions had not changed despite the additional background information he received. Arguably, the only "new" testimony presented at the evidentiary hearing came from Dr. Lipman, who explained his theory of "metabolic intoxication" and how Pietri's drug addiction affected his mental state. However, while Dr. Caddy did not refer explicitly to a state of "metabolic intoxication," the penalty phase record clearly reflects that he testified regarding the impact of Pietri's drug addiction, and both Jody Iodice and Dr. Caddy testified with respect to what occurs when a person is withdrawing after excessively using cocaine. Based upon the evidence presented at the penalty phase, it is unquestionable that Dr. Lipman's theory would not have changed the result, as the jury was presented with identical evidence of the effects of Pietri's drug usage.
We have held that a new sentencing hearing is warranted "in cases which entail psychiatric examinations so grossly insufficient that they ignore clear indications of either mental retardation or organic brain damage." Rose, 617 So.2d at 295 (quoting State v. Sireci, 502 So.2d 1221, 1224 (Fla.1987)). Although a more limited examination of Pietri was conducted at the time of the penalty phase, the results of the examination conducted for the postconviction hearing showed Pietri has an IQ of 76 and that he performed normally or in the mild to moderately impaired range. Only Dr. Lipman opined that Pietri suffered from organic brain damage, although Goldberg also concluded that Pietri presented signs of some brain impairment. Importantly, the testimony of experts presented during the evidentiary hearing were not consistent among the experts, as they did not all agree that Pietri satisfied the two statutory mental health mitigators. The experts even contradicted themselves, as Dr. Lipman testified that Pietri did satisfy certain mitigating factors, while Drs. Caddy and Goldberg were of the opinion he did not. Notably, Pietri questioned, in his brief to this Court, why defense counsel did not inquire of Dr. Caddy during the penalty phase with regard to his opinion as to the presence of the two statutory mental health mitigators. Dr. Caddy's postconviction testimony directly answered that question  he was not questioned about them because in his opinion they were not satisfied. Based upon the evidence presented with respect to the mental health experts during the evidentiary hearing, we conclude that Pietri failed to satisfy either prong of the Strickland test. Defense counsel was not deficient in their investigation and presentation of mental health evidence, and even if deficient, Pietri has totally failed to demonstrate any prejudice.
Pietri also posits that counsel was ineffective for failing to adequately investigate Pietri's drug history by interviewing *267 family and friends, and for failing to adequately inform the jury concerning Pietri's horrible background, including the difficulties of his childhood and the full extent of his addiction history. To support this claim he presented six lay witnesses at the evidentiary hearing who testified with regard to Pietri's childhood and drug addiction. We likewise deny this claim, as the testimony provided during the evidentiary hearing was wholly cumulative to that provided during the penalty phase. See Brown v. State, 755 So.2d 616, 636-37 (Fla.2000) ("We also conclude that the circuit court was correct in its conclusion that the failure to present additional lay witnesses to describe Brown's childhood abuse and low intelligence was not prejudicial to Brown in accord with the requirements of Strickland. Such evidence would have been cumulative in that substantially the same information had been presented by other witnesses and was potentially harmful to Brown's case."). Additionally, we noted in our opinion issued in connection with the direct appeal that there was competent substantial evidence to support the trial court's rejection of mitigation, and that "[e]ven if the trial court had found mitigators including a deprived childhood, we cannot say there is a reasonable likelihood that the trial court would have imposed a different sentence." Pietri, 644 So.2d at 1354 (emphasis supplied).
The first witness Pietri presented at the evidentiary hearing was Yoris Santana, who had also previously testified during the penalty phase. Santana's testimony at the evidentiary hearing was virtually identical to his penalty phase testimony. He stated that Pietri's drug use on the days before the murder was "uncontrollable," and that he was out of his mind during that time  he was constantly nervous and he was agitated by everything. The remaining five witnesses presented were three of Pietri's brothers, one sister, and one sister-in-law. As Pietri's brothers and sisters previously testified during the penalty phase, the brothers and sisters who testified at the evidentiary hearing related the poor family background and the alcoholism of a father who beat them and their mother and eventually abandoned the family. They also discussed when Pietri began using drugs and the impact of his addiction upon his personality. His sister, Virginia Morales, did add that in her opinion, Pietri was not a happy little boy  he was not "normal." However, she also noted that Pietri was only two or three when their father left, and that Pietri actually had a better existence than many of the other children because while there was very little food to eat when the father lived with the family, as an infant Pietri was able to breast feed. Notably, no one who testified during the evidentiary hearing was questioned regarding Pietri's alleged sexual abuse. Finally, while the lay witnesses at the evidentiary hearing did testify in somewhat greater detail with respect to the effect cocaine had on Pietri, we note that Pietri's sister testified during the penalty phase that cocaine use caused Pietri to be paranoid and scared. As the evidence presented during the evidentiary hearing was wholly cumulative with regard to a deprived childhood and drug addiction, as a result of Pietri's own guilt phase testimony and the lay witnesses presented during the penalty phase, we hold that defense counsel was not ineffective for failing to present additional lay witnesses during the trial proceedings.

Public Records Request
The postconviction record reflects that the State informed the trial court on the last day of the evidentiary hearing of a letter that the victim's father had received from a local attorney. The State informed the court that the attorney was apparently opposed to the death penalty, and had *268 suggested in the letter that the victim's father could settle the case against Pietri by agreeing to a sentence of life without parole. The State noted that it wanted the court to be aware of the letter because at the time the crime was committed, life without parole was not an allowable sentence, and the State was concerned that an attorney was suggesting to the victim's father that the case could be resolved with an illegal sentence. The State informed the court that the attorney who wrote the letter was in no way affiliated with the Pietri case.
Following the evidentiary hearing, Pietri filed an affidavit requesting that the State produce the letter, claiming it was relevant to the subject matter of the postconviction proceeding. This affidavit was apparently ignored by the State. Subsequently, Pietri filed a motion to compel production of the letter. Pietri asserted that prompt release of the records was necessary to ensure timely adjudication of all the issues in his postconviction case, and that without the records to which he was entitled he could not fully investigate his case. Before the State replied to the motion to compel or the court ruled on Pietri's motion, the trial court entered its final order denying Pietri postconviction relief.
After the court had denied postconviction relief, the State responded to Pietri's motion to compel. The State argued that the letter was not a public record, as it was written by a private attorney unconnected with the case and sent to a private citizen, namely the victim's father. Further, the State asserted that it was not in possession of the letter and the letter was not part of the State's file in this case. The State maintained that the letter was addressed to the victim's father and belonged to him and, therefore, it was not subject to disclosure under public records laws. Subsequently, the trial court entered an order denying Pietri's motion to compel.
Pietri argues that the trial court should have held a hearing and ruled on the motion to compel prior to issuing its order denying postconviction relief. He relies upon Ventura v. State, 673 So.2d 479 (Fla.1996), in which we held that a trial court had erred in prematurely considering and dismissing a 3.850 motion before all public records issues were resolved. See id. at 481. However, unlike the instant action, Ventura involved records that had been improperly withheld, records to which the defendant there was entitled. See id. at 480. Here, the trial court did not err in ultimately denying Pietri's motion to compel and, therefore, any error in issuing the order denying postconviction relief prior to denying the motion to compel was harmless.
"A circuit court's ruling on a public records request filed pursuant to a rule 3.850 motion will be sustained on review absent an abuse of discretion." State v. Coney, 845 So.2d 120, 137 (Fla.2003). Chapter 119 of the Florida Statutes defines "public records" as "all documents, papers, letters, maps, books, tapes, photographs, films, sound recordings, data processing software, or other material, regardless of the physical form, characteristics, or means of transmission, made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency." § 119.011(1), Fla. Stat. (2003). In State v. Kokal, 562 So.2d 324 (Fla.1990), we even recognized that not all documents in possession of the State are public records. See id. at 327. There, we noted:
We do agree with the state attorney that some of the documents in his files are not public records. In Shevin v. Byron, Harless, Schaffer, Reid & Associates, *269 Inc., 379 So.2d 633, 640 (Fla.1980), we pointed out:
To give content to the public records law which is consistent with the most common understanding of the term "record," we hold that a public record, for purposes of section 119.011(1), is any material prepared in connection with official agency business which is intended to perpetuate, communicate, or formalize knowledge of some type.
Id.; see also Johnson v. Butterworth, 713 So.2d 985, 986 (Fla.1998). Pietri has not cited any authority to support his claim that this letter written by a private attorney unconnected to the case to the family of the victim constitutes a public record that must be disclosed pursuant to chapter 119. Unquestionably, the letter was neither prepared by nor received by any state agency in connection with the preparation of Pietri's trial, appeal, or postconviction action. Therefore, the trial court did not err in denying Pietri's motion to compel production of the letter. Pietri is not entitled to disclosure of the letter, and hence his claim here is denied.

Adoption of the State's Post-Evidentiary Hearing Memorandum
Pietri next asserts that by adopting the State's post-evidentiary hearing memorandum, the lower court abdicated any responsibility for independently making findings of fact and conclusions of law. Pietri's claim is without merit. In Glock v. Moore, 776 So.2d 243 (Fla.2001), we held that a trial court had not committed error by adopting the State's proposed order denying postconviction relief. See id. at 248-49. There, we wrote:
As to the issue of the adoption of the State's order, this Court has rejected similar challenges where the defendant had notice of the request for proposed orders and an opportunity to submit his or her own proposal and/or objections. See, e.g., Patton v. State, 784 So.2d 380, 386-91 (Fla.2000); Groover v. State, 640 So.2d 1077, 1078-79 (Fla.1994). In Groover, for example, this Court held that the trial court's adoption of the State's proposed order denying a capital defendant relief on his 3.850 motion did not constitute a due process violation where the trial court signed the State's proposed order three days after defense counsel received a copy and the defendant had an opportunity to argue all of the issues in his brief and at a hearing. 640 So.2d at 1079. The Court explained that even though the defendant did not have the ability to file his own proposed order, his ability to raise objections negated any due process concerns. See id.; see also Hardwick v. Dugger, 648 So.2d 100, 104 (Fla.1994) (holding that verbatim adoption of State's proposed order on a capital defendant's 3.850 motion was not error because both parties stipulated to the filing of post-hearing memoranda, the State served its proposed order on defense counsel months before the trial court signed the State's order, and defense counsel filed an extensive response to the State's proposed order).
On the other hand, this Court has found a due process violation to exist when the defendant was not served with a copy of the State's proposed order or given an opportunity to file objections. See Rose v. State, 601 So.2d 1181, 1182 (Fla.1992); see also Huff v. State, 622 So.2d 982, 983 (Fla.1993). In contrast to Rose and Huff, in this case Glock's counsel had notice that the trial court asked the State to prepare a proposed order and Glock submitted objections to the State's proposed order.
Id. The judge in the instant action did not simply sign a proposed order written by the State. Instead, the judge authored *270 his own one-page order in which he "incorporated by reference" the State's post-evidentiary hearing memorandum. The record reflects that at the end of the evidentiary hearing the judge requested that both parties file post-evidentiary hearing memoranda. Both parties agreed, without objection, to do so. The State filed its memorandum on July 5, 2002, well over a month before the trial court issued its order on August 27, 2002, denying postconviction relief. Pietri filed his memorandum on July 8, 2002. The record does not reflect that Pietri in any way objected to or claimed error with regard to the State's memorandum, despite sufficient time to do so prior to the trial court's issuance of its order denying postconviction relief.
Pursuant to Glock and the numerous cases cited therein, this claim is denied. Pietri stipulated to the filing of the post-evidentiary hearing memoranda and did in fact file his own memorandum. The trial court considered both memos for well over a month before entering its final order. Pietri did not challenge the State's memorandum. A review of the State's memo demonstrates that it is not facially deficient and the conclusions therein are supported by the record. Therefore, this claim is without merit. However, while we hold that the trial court's actions here were not erroneous, we write further to explicitly discourage trial court judges from engaging in the practice of simply adopting either the State's post-evidentiary hearing memorandum of law or a memorandum submitted by a defendant. The better practice is for the trial judge to compose the final order, in which the court reviews the testimony given and evaluates the credibility of the witnesses presented. An unquestionably independent review and independent order best serve the parties involved and the appellate process in these actions that may result in the ultimate punishment.

Stolen Documents
Pietri argues that his defense counsel rendered ineffective assistance by failing to properly investigate and litigate issues concerning a document that was allegedly stolen from his counsel's investigator and obtained by the State. The record reflects that on August 24, 1989, defense counsel filed a Motion to Compel Return of Documents. The motion noted that it had come to the attention of defense counsel that the State was in possession of documents that were obtained from defense counsel's investigator, Virginia Snyder. The Delray Beach Police Department had obtained the documents, and defense counsel asserted that they were within the purview of the attorney-client privilege and were strictly confidential. On that same day, defense counsel also filed a Motion to Compel Disclosure, requesting that the court order the State to disclose to the defense the names of all persons who had access to the documents obtained from Virginia Snyder. Those motions were both granted by the trial court and depositions of involved parties were subsequently taken.
On December 27, 1989, defense counsel filed a Motion to Dismiss or Delay Proceedings Until State Investigation is Complete. Counsel asserted that the State was investigating Nancy Adams and her role in the procurement of the documents from Virginia Snyder's office and that the defendant was unable to establish the extent of any constitutional violations until the investigation was complete. A hearing on the motion was held on December 28, 1989.
At the hearing, defense counsel explained that the relevant document, dated June 11, 1989, contained an in-depth interview between the investigator, Snyder, and *271 Pietri. In it, Pietri had explained everything that happened on the day of the offense. Defense counsel asserted that the entire defense strategy was contained in the document. Both parties agreed that Nancy Adams, the woman who allegedly obtained the document from Virginia Snyder's office, had invoked her Fifth Amendment right against self-incrimination and would not testify regarding how she obtained the document.
It was revealed during the hearing that the Delray Beach Police Department was investigating a security leak within their own department after learning of the leak from Nancy Adams. The Department suspected, based on information from Adams, that Virginia Snyder was involved in the leak and had access to private information. Virginia Snyder, who testified during the hearing, stated that Adams was a volunteer in her office. The main issue in dispute was whether Adams, working for the police, surreptitiously obtained the Pietri document, or was voluntarily given the document by Snyder. Although Adams refused to testify at the hearing, in a deposition before the hearing she asserted that Snyder had given her the document, as well as complete access to her office. Snyder testified that she never discussed the Pietri case with Adams, she never gave Adams access to the file, Adams was never left alone in Snyder's office, and she absolutely never gave Adams the Pietri document. Defense counsel argued that they could not ascertain the extent of any constitutional violation until it was established whether Adams was given the document by a member of the defense team, namely Snyder, or Adams stole the document either of her own volition or under the direction of the police department.
The state attorney maintained that he had never read the document and did not know what it contained. The document was, however, read by members of the Delray Beach Police Department. The Delray Beach Police Department was not involved in the investigation of Pietri; however, members of the department did arrest Pietri for the offense and attempted to locate, unsuccessfully, the weapon that was used to commit the offense. The trial court denied, without explanation, both the motion to dismiss the indictment and the motion to delay the trial. Pietri now asserts that trial counsel was ineffective for failing to raise additional arguments, namely that counsel should have moved for a recusal of the state attorney's office, should have moved to bar any testimony from the Delray Beach Police Department, and should have moved to have all statements made by Pietri suppressed. This claim is denied, as it is clear that Pietri was not, in any way, prejudiced by his counsel's failure to present these proposed additional arguments.
Important to this issue, it must be noted that Pietri had initially asserted his total innocence with regard to the offense. Defense counsel testified at the postconviction hearing that until approximately one month before trial, the defense was firmly based on the position that someone else, a man named Cholo, had committed the actual murder. Shortly before the trial began, however, Pietri contacted his defense attorney, and admitted to him what had actually happened  that it was he who had shot the police officer.[13] It was then, for the first time, that Pietri informed his counsel that it was his desire to admit that he had shot the officer and that he wanted to present an available defense that would *272 be consistent with such admission. Although the record does not contain a copy of the purloined document, the record reflects that the document was written on June 11, 1989, over six months before Pietri informed his defense counsel that he had committed the act. It was written at a time when defense counsel had planned to utilize an innocence defense. Assuming that the document did contain the entire defense strategy as asserted by defense counsel, it can be further assumed with certainty that the strategy expressed in that document was one of total innocence, and it did not contain a confession by Pietri, as Pietri did not change his version of the events until December 1989. The record supports the foundation that it is most probable that any strategy contained in the document was wholly different, in fact, the exact opposite of that which was presented at trial. Further, it appears that the strategy actually utilized at trial was a result of the defendant's change of heart after a "jailhouse conversion" and was not produced by the leak of the document. The record reflects that defense counsel learned of the stolen document in August 1989, yet continued the plan to utilize the original innocence defense until December 1989. Clearly, the release of the document did not cause counsel to change strategy. Therefore, Pietri cannot demonstrate any prejudice related to the purloined document as his entire defense changed long after the document was taken, and was changed based exclusively on his desire to be truthful.
Additionally, even if the document did contain the strategy that defense counsel intended to use at that time, this claim would still be without merit. The trial judge had denied defense counsel's motion to dismiss the indictment and motion to delay the proceedings, and it is more likely than not that he would have likewise denied any additional motions for relief. Further, the United States Supreme Court has held that intrusions into the attorney-client relationship do not establish a per se Sixth Amendment violation and there must be a showing of prejudice in terms of injury to the defendant or benefit to the State before a violation arises. See Weatherford v. Bursey, 429 U.S. 545, 558, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). The state attorney maintained that he never read nor had access to the stolen document, and defense counsel did not challenge that assertion. Because the state attorney had no access to the document, Pietri has failed to demonstrate how he was prejudiced by the state attorney prosecuting the case. Further, the three Delray Beach Police Department officers who testified at Pietri's trial also had not read the document, and their testimony was limited simply to their involvement in Pietri's arrest. Again, Pietri has failed to demonstrate any connection between any information in the document and the officers who testified, or how he was prejudiced by their testimony. Finally, Pietri alleges that by not moving to suppress all statements made by him, his counsel involuntarily waived his right to remain silent. As noted above, Pietri himself chose to testify at trial to afford the opportunity to admit to the jury that he shot Officer Chappell. Therefore, Pietri, of his own volition, elected to waive his right to remain silent. All of these related claims asserted by Pietri are without merit and counsel was not ineffective for failing to explore them.[14]

*273 PETITION FOR WRIT OF HABEAS CORPUS
Pietri's first claim  that appellate counsel was ineffective for failing to challenge the trial court's ruling denying the defendant's motion for a change of venue  is procedurally barred, as it was previously presented on direct appeal. See Pietri, 644 So.2d at 1352; see also Porter v. Crosby, 840 So.2d 981, 984 (Fla.2003) ("[C]laims raised in a habeas petition which petitioner has raised in prior proceedings and which have been previously decided on the merits in those proceedings are procedurally barred in the habeas petition."); Parker v. Dugger, 550 So.2d 459, 460 (Fla.1989) ("[H]abeas corpus petitions are not to be used for additional appeals on questions which ... were raised on appeal or in a rule 3.850 motion...."); Rutherford v. Moore, 774 So.2d 637, 645 (Fla.2000) (holding that when a claim was actually raised on direct appeal, the Court will not consider a claim that appellate counsel was ineffective for failing to present additional arguments in support of the claim on appeal).
In his second claim, Pietri asserts that his appellate counsel rendered ineffective assistance by failing to properly investigate and litigate issues concerning a document allegedly stolen from his defense counsel's investigator. This issue is based upon the same facts as Pietri's related 3.850 claim. In the instant claim, Pietri asserts that because trial counsel moved for a dismissal of the indictment or a delay in the trial, and made a continuing objection, the issue was preserved for appeal, and appellate counsel should have raised the issue on direct appeal. As with Pietri's similar 3.850 claim, this claim is denied as it is without merit, and appellate counsel cannot be ineffective for failing to present a meritless claim.
We again note that the United States Supreme Court has held that intrusions into the attorney-client relationship do not establish a Sixth Amendment violation unless there is a showing of prejudice in terms of injury to the defendant or benefit to the State. See Weatherford v. Bursey, 429 U.S. 545, 558, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). Further, the high Court has also held that dismissal of an indictment as a sanction for government intrusion into the attorney-client relationship is inappropriate absent demonstrable prejudice to the defendant or substantial threat thereof. See United States v. Morrison, 449 U.S. 361, 365-66, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981).
Pietri has failed to demonstrate prejudice as a result of the document being leaked from his counsel's investigator's office. In his petition for a writ of habeas corpus, he asserted: "The eventual decision to have Mr. Pietri testify at the guilt phase as the only defense witness was directly related to the exposure of the document stolen from Mr. Pietri's defense investigator's office by Nancy Adams." This assertion is entirely without merit, as Pietri's defense counsel testified at the postconviction hearing that Pietri himself called him less than one month before the trial began (and over four months after counsel learned of the allegedly stolen document) and stated that he wished to testify and admit that he had shot Officer Chappell. The record reflects that it was Pietri's decision to testify, and that decision was unquestionably not a result of the "exposure of the document."
*274 Further, Pietri contends that he was "left defenseless on the witness stand" because defense counsel failed to object when the State questioned him about lying to the police, and that "[t]he evidence of collateral crimes, use of marijuana, unadjudicated offenses, and the course of conduct related to the capital offense all came into the record out of the defendant's mouth with defense counsel mute." Pietri has not asserted that this line of questioning was a result of the State having read the document. Pietri does not assert that the State had access to or read the document, but he attempts to claim that the State somehow benefitted from the document. The line of questioning that Pietri has referred to in his brief was a result of his own desire to tell the truth. Importantly, four of the pages Pietri has referenced as containing testimony to which trial counsel should have objected were actually included within Pietri's direct testimony, and the information revealed on those pages was elicited by defense trial counsel. The record is abundantly clear that Pietri wanted to tell the truth, and defense counsel's trial strategy was to demonstrate that Pietri lacked the specific intent to commit the crime. The State did not have access to the stolen document, and Pietri has failed to demonstrate that his defense was injured as a result of the document's exposure to the Delray Beach Police Department. Therefore, the trial court did not err in refusing to grant defense counsel's motion to dismiss the indictment, and appellate counsel was not ineffective for failing to assert the issue on direct appeal.
In his next habeas claim, Pietri challenges the judge's instructions with regard to the aggravating factors which could be considered. At the close of the presentation of evidence during the penalty phase, the trial court instructed the jury with respect to the aggravating factors in the following manner:
The aggravating circumstances that you may consider are limited to any of the following that are established by the evidence.
Number one: The crime for which Norberto Pietri is to be sentenced was committed while he was under sentence of imprisonment.
Number two: The crime for which the Defendant is to be sentenced was committed while he was engaged in flight after committing or attempting to commit the crime of burglary.
Number three: The crime for which the Defendant is to be sentenced was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
Number four: The crime for which the Defendant is to be sentenced was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
Number five: The crime for which the Defendant is to be sentenced was committed in a cold, calculated and premeditated manner, without any pretense of moral or legal justification.
This factor requires a heightened degree of premeditation beyond the premeditation required for first-degree murder.
Calculate means to plan the nature of beforehand, to think out, design, prepare or adapt by forethought or careful plan.
Six: The victim of the crimes was a law enforcement officer engaged in the performance of his official duties.
The jury recommended a death sentence by a vote of eight to four. See Pietri, 644 So.2d at 1349. The trial court followed the jury's recommendation and imposed a sentence of death. See id. In support of the death sentence, the trial judge found four aggravating circumstances: (1) the murder *275 was committed by one under a sentence of imprisonment; (2) the murder was committed while Pietri was fleeing after committing a burglary; (3) the murder was a homicide committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification; and (4) the murder was committed to avoid arrest or to escape, the murder was committed to disrupt or hinder the lawful enforcement of laws, and the victim was a law enforcement officer performing his official duties. See id. On direct appeal we held that the trial court erred in finding the CCP aggravator. See id. at 1353. However, we also held that the remaining three factors supported the death penalty, and therefore the elimination of the CCP aggravator did not warrant reversal of the death penalty. See id. at 1353-54.
As noted, the trial judge instructed the jury with respect to six aggravating factors. In his instant habeas claim, Pietri has not specifically identified which of the six instructions was "wholly inadequate." However, he does concede that had the jury been properly instructed it would have found only one aggravator, namely that Pietri was under a sentence of imprisonment at the time of the offense (instruction number one). Therefore, as Pietri concedes that the aggravator properly could have been found, it necessarily follows that he is not challenging the trial court's instruction with respect to that aggravator.
Any challenge to the judge's instructions with regard to the aggravating circumstances that the murder was committed to avoid arrest or to escape, the murder was committed to disrupt or hinder the lawful enforcement of laws, and the victim was a law enforcement officer performing his official duties is procedurally barred. On direct appeal, this Court rejected Pietri's contention that the trial court erred in instructing the jury on three aggravating factors (factors three, four, and six of the judge's instructions) that could only be treated as a single aggravating circumstance. See id. at 1354 n. 11. As Pietri's challenge of these three factors was rejected on direct appeal, he is procedurally barred from again challenging them in a habeas petition. See Porter v. Crosby, 840 So.2d 981, 984 (Fla.2003) ("[C]laims raised in a habeas petition which petitioner has raised in prior proceedings and which have been previously decided on the merits in those proceedings are procedurally barred in the habeas petition."); Parker v. Dugger, 550 So.2d 459, 460 (Fla.1989) ("[H]abeas corpus petitions are not to be used for additional appeals on questions which ... were raised on appeal or in a rule 3.850 motion....").
To the extent Pietri is challenging the trial court's instruction on the CCP aggravator, this claim is likewise without merit. The jury instructions given by the trial judge were verbatim the standard jury instructions in effect at the time of Pietri's trial, with the exception of instruction number five concerning the CCP aggravator. See Fla. Std. Jury Instr. (Crim.) 7.11 (1989). Pursuant to the standard jury instructions in effect at the time of Pietri's trial, the judge was only required to instruct the jury that "[t]he crime for which the defendant is to be sentenced was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification." Id. However, Pietri's trial judge further offered: "This factor requires a heightened degree of premeditation beyond the premeditation required for first-degree murder. Calculate means to plan the nature of beforehand, to think out, design, prepare or adapt by forethought or careful plan."
In Jackson v. State, 648 So.2d 85, 90 (Fla.1994), this Court struck, as *276 unconstitutionally vague, the standard CCP jury instruction in effect at the time of Pietri's trial. However, we also held that "[c]laims that the instruction on the cold, calculated, and premeditated aggravator is unconstitutionally vague are procedurally barred unless a specific objection is made at trial and pursued on appeal." Id. While Pietri successfully challenged on direct appeal the finding of CCP, he did not challenge the trial court's instruction on this factor. Therefore, he is procedurally barred from doing so now. Further, any error that may have occurred in the giving of the instruction was totally harmless, as this Court held on direct appeal that the CCP aggravator was not supported by the record. Pietri, 644 So.2d at 1353; see Jones v. Moore, 794 So.2d 579, 590 (Fla.2001) ("In Foster v. State, 679 So.2d 747 (Fla.1996), this Court made clear that a jury is presumed not to have weighed properly instructed aggravators that subsequently are found not to exist.").
Finally, any challenge to the remaining factor, the felony murder aggravator (instruction number two), is likewise denied. In Floyd v. State, 808 So.2d 175 (Fla.2002), we rejected a habeas petitioner's claim that his appellate counsel was ineffective for failing to challenge the adequacy of the felony murder jury instruction, noting that the court had given the standard jury instruction. See id. at 186. Here, the trial court read the standard jury instruction in effect at both the time of the trial and today. Therefore, there is no merit to Pietri's claim that the instruction was inadequate. Because the jury was properly instructed with respect to all six aggravating factors, Pietri's instant claim is denied.
Pietri's final claim is that Florida's death penalty sentencing scheme is unconstitutional under the United States Supreme Court's recent decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court recently addressed Pietri's contention in Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002), and denied relief. Pietri is likewise not entitled to relief on this claim. Moreover, we note that the trial court found as an aggravating factor that Pietri committed the murder while fleeing after committing a felony, namely burglary. This felony murder aggravating factor involves circumstances that were submitted to a jury and found to exist beyond a reasonable doubt. Thus, relief based upon Ring is denied. See Owen v. Crosby, 854 So.2d 182, 193 (Fla.2003).

CONCLUSION
In summary, we affirm the trial court's denial of Pietri's motion for postconviction relief, and further deny his petition for a writ of habeas corpus.
It is so ordered.
PARIENTE, C.J., and WELLS, LEWIS, QUINCE, and BELL, JJ., concur.
CANTERO, J., concurs specially with an opinion, in which WELLS and BELL, JJ., concur.
ANSTEAD, J., concurs in result only.
CANTERO, J., specially concurring.
I concur in the majority opinion. Moreover, regarding the petitioner's claim that Florida's capital sentencing scheme violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), I would hold, for the reasons stated in my specially concurring opinion in Windom v. State, 29 Fla. L. Weekly S191, S197-203, ___ So.2d *277 ___, ___-___, 2004 WL 1057640 (Fla. May 6, 2004), that Ring does not apply retroactively.
WELLS and BELL, JJ., concur.
NOTES
[1] In addition to first-degree murder, Pietri was also charged with fifteen noncapital offenses. See Pietri, 644 So.2d at 1349 n. 1. He was convicted of fourteen of those offenses. See id. As part of a stipulation between the State and the defense, Pietri was not adjudicated guilty or sentenced for three of the counts, and one additional count was nolle prossed. See id. Pietri was adjudicated guilty and sentenced for the remaining ten noncapital offenses. See id. The convictions and sentences for those offenses are not relevant here.
[2] The final aggravating factor consisted of three individual aggravators merged and considered as one factor. See Pietri, 644 So.2d at 1349 n. 5.
[3] The second issue on which Pietri was granted relief was with respect to the trial court's failure to prepare a sentencing guidelines scoresheet for the ten noncapital offenses for which Pietri was also adjudicated guilty. See Pietri, 644 So.2d at 1355. We vacated the sentences for those offenses and remanded the case to the trial court for resentencing on the noncapital offenses after a scoresheet had been prepared. See id.
[4] Huff v. State, 622 So.2d 982 (Fla.1993).
[5] Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
[6] The ten claims presented by Pietri are: (1) ineffective assistance of counsel (hereinafter "IAOC") for failing to raise a voluntary intoxication defense during the guilt phase; (2) IAOC during the jury selection process; (3) the trial court erred in adjudicating Pietri guilty of first-degree murder; (4) IAOC for failing to adequately investigate and present available mitigation during the penalty phase; (5) the trial court erred in denying Pietri's public records request; (6) the postconviction trial court erred in adopting the State's post-evidentiary hearing memorandum as part of its order denying Pietri's postconviction motion; (7) Pietri is insane to be executed; (8) cumulative error; (9) IAOC for failing to properly investigate and litigate issues concerning a document allegedly stolen from counsel's investigator and obtained by the State; and (10) IAOC for failing to object to the trial court's sentencing order, in which the court adopted the State's sentencing memorandum.
[7] The four claims raised by Pietri in his petition for a writ of habeas corpus are: (1) ineffective assistance of appellate counsel for failing to challenge the trial court's ruling denying the defendant's motion for a change of venue; (2) ineffective assistance of appellate counsel for failing to properly investigate and litigate the issues concerning a document allegedly stolen from counsel's investigator and obtained by the State; (3) the instructions provided to the jury with respect to the aggravating factors were wholly inadequate and, therefore, it was fundamental error to give such instructions; and (4) Florida's capital sentencing scheme is unconstitutional.
[8] In his third claim  that the trial court erred in adjudicating Pietri guilty of first-degree murder  Pietri relies upon the same arguments as presented in his first claim. Therefore, for the same reasons as noted above, we deny Pietri's third claim.
[9] Norberto Pietri was one of fourteen children.
[10] Pietri's mother had five more children with other men after his father left their family.
[11] A mistrial was declared before the jury was sworn. However, the trial began again on January 29, 1990.
[12] Apparently the victim's father refused to accept the plea agreement.
[13] Pietri apparently experienced a "jailhouse conversion" and decided that he needed to be truthful about what had occurred.
[14] Pietri's remaining three claims are also all denied. Claim seven, asserting that he is insane to be executed, is not ripe for review. See Griffin v. State, 866 So.2d 1, 21-22 (Fla.2003). Claim eight, asserting cumulative error, is without merit. See id. at 22 ("[W]here individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error must fail."); see also Downs v. State, 740 So.2d 506, 509 n. 5 (Fla.1999). Finally, claim ten, regarding the trial court's adoption of the State's sentencing memorandum, is denied as it could have been raised on direct appeal. See Cherry v. State, 659 So.2d 1069, 1072 (Fla.1995).